# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

DONALD J. NIEMI,

        Plaintiff,

    v.                                          Case No. 12-C-0157

CAROLYN W. COLVIN,
Commissioner of Social Security,

        Defendant.

---

## DECISION AND ORDER

---

This is an action for review of the final decision of the Commissioner of Social Security denying plaintiff's application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act. Plaintiff Donald J. Niemi challenges the Administrative Law Judges's (ALJ's) decision denying him benefits because he argues the ALJ failed to follow Social Security Administration (SSA) rulings and regulations. In particular, Niemi argues that the ALJ erred by failing to give controlling weight to Niemi's treatment provider and failed to properly assess Niemi's credibility. For the reasons stated in this opinion, the Commissioner's decision will be remanded.

## BACKGROUND

Niemi filed an application for Supplemental Security Income benefits on May 27, 2008, alleging disability due to back problems, knee problems, and depression. He was 32 years of age at the time. The record indicates that Niemi has consistently sought treatment for chronic low back pain since at least 2005 and his back problems date back to 1999 when he was involved in a motor

vehicle accident. (Tr. 332.) Since 2005, he states that his pain has also been exacerbated by several subsequent accidents, including an injury while lifting drywall in 2007 (Tr. 385), an injury moving a couch and a second car accident in 2008 (Tr. 428), and several injuries in 2009 (Tr. 863, 872, 904.) The SSA denied the initial application on December 3, 2008. After his application and request for reconsideration were denied, Niemi requested an administrative hearing. The ALJ held a hearing on June 29, 2010. Both Niemi and a vocational expert testified at the hearing. (Tr. 12-64.)

The ALJ found Niemi had two severe impairments: degenerative disc disease of the cervical spine and lumbar spine, and degenerative joint disease of the left hip and right knee. (Tr. 73.) The ALJ also considered Niemi's non-severe impairments, which the ALJ determined included, among other things, depression. (Tr. 76.) The ALJ concluded that, based on the record, Niemi's symptoms of depression caused no more than mild limitations in activities of daily living, social functioning, and maintaining concentration, persistence or pace. (Tr. 76.) He also found that Niemi had suffered no episodes of decompensation of extended duration. (Tr. 76.)

At step three, the ALJ determined that Niemi's impairments did not meet or medically equal any listed impairments under 20 C.F.R. § 404, Subpt. P, App. 1. (Tr. 74.) The ALJ found that Niemi could not demonstrate that his "claimed spine disorders were sufficiently aggravated to meet the definition" of Listing 1.04. (Tr. 75.) The ALJ explained that while Niemi presented evidence of reduced range of motion in his lower back, the medical evidence, including examinations performed in November and December 2008 and May and August 2009 "did not show the documented neurological loss required by the listings." (Tr. 75.) In addition, the ALJ concluded that Niemi did not meet the listing for dysfunction of a joint; although he complained of problems with his left ankle and right knee, his symptoms did not rise to the level of a listed impairment.

2

Likewise, the ALJ found no medically relevant support to find that Niemi was per se disabled due to neck, shoulder, arm, or hand pain under Listing 1.02B. (Tr. 75.) Although Niemi reported increased pain in his neck and shoulder, the ALJ explained that Niemi's MRIs revealed no evidence of rotator cuff tears, joint effusion, or acute bony abnormality with degenerative changes. (Tr. 75.) Moreover, the ALJ found that all range of motion maneuvers were found to be within limits, and he had no neurological abnormalities, he had intact sensation, and he had normal motor strength and tone. (Tr. 75.) Nor were there any significant limitations with reaching, handling, or fingering. (Tr. 75-76.) The ALJ determined that Niemi had the following residual functional capacity RFC:

> claimant's impairments limit him to perform the demands of unskilled, sedentary work as defined in 20 C.F.R. § 416.967(a) that does not require continuous sitting, standing, or walking in excess of one hour at which time the claimant requires a one to two minute period of position change (to accommodate for related pain and the effects of pain medication regimen). Sedentary work requires lifting no more than 10 pounds on an occasional basis only, sitting up to 6 hours and standing and walking up to 2 hours in an 8-hour day.

(Tr. 77.) With these limitations, the ALJ found that Niemi was unable to perform past relevant work as a prep-cook and construction worker. (Tr. 77.)

However, the ALJ found that given Niemi's age, education, work experience, and RFC, there were a significant number of jobs in the national economy that he could perform. (Tr. 78-79.) Based on these findings, the ALJ concluded that Niemi was not disabled with the meaning of the Social Security Act. (Tr. 79.) The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Niemi's request for review on December 15, 2011. (Tr. 1-3.) Thereafter, Neimi commenced this action for judicial review.

3

# STANDARD OF REVIEW

On judicial review, a court will uphold the Commissioner's decision if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010); *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). "Substantial evidence is 'such relevant evidence as a reasonable mind could accept as adequate to support a conclusion.'" *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). A decision denying benefits need not discuss every piece of evidence, but when an ALJ fails to provide adequate support for the conclusions drawn, remand is appropriate. *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). The ALJ is also expected to follow the Agency's own rulings and regulations in making a determination. Failure to do so, unless the error is harmless, also requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). The court reviews the entire record but does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). In addition, judicial review is limited to the rationales offered by the ALJ, and the court cannot affirm based on post-hoc justifications. *Shauger v. Astrue*, 675 F.3d 369, 373 (7th Cir. 1999).

# ANALYSIS

## I.      Credibility Assessment

Niemi challenges the ALJ's almost singular emphasis on Niemi's ability to perform certain daily activities as a reason to discount the credibility of his testimony. (Tr. 77-78) The ALJ concluded that Niemi was independent in his activities of daily living. (Tr. 77.) He found Niemi

4

was able to spend time caring for and playing with his children. The ALJ also found that Niemi could help around the house, sweep, vacuum, change diapers, fix meals, shop for groceries with the help of his fiancé, watch movies, go camping, and play video games and cards. (Tr. 77.) The ALJ concluded that the record supported a finding that Niemi "was able to carry on, albeit with some difficulty, various daily activities, and that he was capable of interacting with people when he wanted to." (Tr. 77.) Niemi argues that while the ALJ "lists several activities Niemi is able to perform, the discussion stops at that point" and therefore, the ALJ's credibility determination was not supported by substantial evidence. (Pl.'s Br. 14, ECF No. 11.)

An ALJ's credibility determination is entitled to "special, but not unlimited, deference." *Shauger*, 675 F.3d at 696. In assessing credibility, the ALJ must consider the factors set forth in the regulations and must support the credibility findings with the objective and other evidence in the record. 20 C.F.R. § 404.1529(c); SSR 96-7p; *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). The ALJ must provide an "accurate and logical bridge" between the evidence and the conclusion. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). In addition, "the ALJ must explain her decision in such a way that allows us to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *McKinzey v. Astrue,* 641 F.3d 884, 890 (7th Cir. 2011). A court will not overturn an ALJ's credibility determination unless it is "patently wrong." *Id.*

Niemi argues the ALJ employed "meaningless boilerplate" language in assessing his credibility, *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012), stating:

> [t]he credible medical evidence, however, does not establish an underlying medical condition so severe as to produce limitations that would preclude all work activity

5

and the claimant's testimony is found credible only to the extent consistent with a residual functional capacity for a range of sedentary work as found above.

(Tr. 77-78.). Niemi asserts that the ALJ took little effort to address Niemi's actual allegations of pain and related limitations, instead stating he found Niemi not credible to the extent necessary to justify his conclusion that Niemi was not disabled. Niemi also argues the ALJ omitted numerous other facts that supported his claim of disability, in contravention to § 416.929(c) and SSR 96-7p.

Use of boilerplate, in and of itself, does not render a credibility determination per se inappropriate. Rather, it is the use of the boilerplate without sufficient explanation that has been sharply criticized. *See Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011); *Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir. 2010); *Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir. 2010). The ALJ must supply "specific reasons" for a credibility finding and must consider several factors, including the claimant's daily activities, level of pain or symptoms, precipitating and aggravating factors, medication, treatment, and limitations. *Villano*, 556 F.3d at 562; 20 C.F.R. § 404.1529(c); SSR 96-7p. The finding must be supported by the evidence and must be specific enough to enable the claimant and a reviewing body to understand the weight given to the claimant's statements and the reasoning applied. *Craft*, 539 F.3d at 678; SSR 96-7p.

The thrust of Niemi's argument is that the activities he admits he regularly performed are not inconsistent with an inability to perform sedentary work. In other words, it is possible that even though he is able to engage in the behaviors described by the ALJ, he is still incapable of holding full-time sedentary work. But, of course, that is not the standard. ALJ's are not required to rule out any possibility that the claimant is disabled. That degree of certainty is not possible given the limitations under which the Agency must operate, and the variety and complexity of the

6

impairments claimed. Moreover, it is the claimant's burden to prove that he has physical and/or

mental impairments of such severity as to render him incapable of performing substantial gainful

activity. When the question comes down to whether the claimant's statements about the intensity,

persistence, or functionally limiting effects of pain or other symptoms are credible, the Agency has

instructed ALJs that they must assess his credibility using the factors set out in SSR 96-7p. These

include:

> 1. The individual's daily activities;
>
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, *3 (S.S.A.).

Since neither the Agency nor the claimant's own doctors follow the claimant around, both

are to a large extent dependent upon the claimant, and perhaps his family or friends, for the

information the Ruling requires the ALJ to consider in assessing the claimant's credibility. As a

result, the ALJ's assessment of the credibility of a claimant's statements about the intensity,

persistence, or functionally limiting effects of pain or other symptoms is necessarily based on other

7

information he has provided to the Agency or his doctors. Unless he expressly contradicts himself, one could argue that it would be impossible to ever find a person who claims his pain and symptoms prevent him from performing work incredible under this ruling. To read the ruling in this way, however, would be unreasonable. It would create an almost unrebuttable presumption that the claimant's testimony must be accepted as true. It would also reverse the burden of proof in disability cases.

But even though the ALJ is not required to completely rule out the possibility that the claimant is disabled before denying his claim, more analysis is required than was provided here. Niemi notes that at the hearing the ALJ asked no questions about the amount of time Niemi spends on his daily activities, how long it takes him to complete activities, or how often he does them. Instead, the ALJ relied on a Function Report Niemi completed in June 2008, in which he described his daily activities and how he spends his time. (Tr. 77, citing Ex. 4E, Tr. 202-10.) In the section of the report asking him to describe what he did from the time he woke up until he went to bed, Niemi wrote that he woke up hurting and tired, took a shower, ate breakfast with his children and watched T.V. He would try doing chores and things around the house, but spent most of the time with his children. When bedtime came, he would take his medication and try to get comfortable. (Tr. 203.) During the day, he cared for three of his five children, ages two, three and five at the time of the hearing in June 2010. According to his 2008 Function Report, Niemi would feed and change his children and watch movies with them. (Tr. 21, 204.) He would prepare meals (sandwiches, salads and cereal) daily, which took only a couple of minutes. (Tr. 205.) He could also vacuum and perform light chores unassisted, which took only a few minutes. (*Id.*) He would go outside a few times a day, and go shopping two times a week for food, diapers, and "household stuff." He stated

8

shopping would take a few minutes, and then he would go wait in the car. (Tr. 206.) He reported

hobbies of watching movies, drawing and playing cards, which he would do a few times a day, but

never finish because he "can't really sit too long, and [with] my ADD, I get really distracted." (Tr.

207.)

Niemi also completed a Function Report in March 2009, however, which suggests that his

condition was deteriorating. In this report, Niemi stated he woke up every day feeling miserable

from pain and lack of sleep. He would take his medication, eat, spend time with his children and

try not to exert himself. Niemi stated he would take his medication throughout the day because of

the pain, watch some television, go outside for a few minutes, but primarily remain inside. (Tr.

237.) He said that his fiancé, who also was not employed, "helps do most of the stuff pertaining to

our children." (Tr. 238.) And although he could make sandwiches, he did not prepare large meals

because he could not stand long enough. He did some light cleaning, which varied in the time it

would take, and stated that his girlfriend did most of the chores. (Tr. 239.) His girlfriend did most

of the shopping, but he would go two or three times a month for food, clothes and diapers. (Tr.

240.) In a later undated Function Report, Niemi's condition seemed to deteriorate even further as

he now claimed he was dependent on his fiancé for getting his medication ready for him and helping

him dress. (Tr. 247.) The ALJ made no reference to the latter two reports.

While an ALJ should consider a claimant's daily activities when evaluating credibility, "this

must be done with care." *Roddy v. Astrue*, ___ F.3d ___, 2013 WL 197924, at *7 (7th Cir. Jan. 18,

2013). "We have repeatedly cautioned that a person's ability to perform daily activities, especially

if that can be done only with significant limitations, does not necessarily translate into an ability to

work full-time." *Id.*; *Bjornson*, 671 F.3d at 647 ("The critical differences between activities of daily

9

living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer."); *Bauer v. Astrue*, 532 F.3d 606, 608-09 (7th Cir. 2008) ("A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days. . . . Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job."); *Hughes v. Astrue*, ___ F.3d ___, 2013 WL 163477, at * (7th Cir. Jan. 16, 2013) (explaining that the ALJ erred in taking into account a claimant's reported ability to do daily activities where he failed to consider the fact that the claimant may have had no choice but to perform such activities, the level of pain experienced while doing the activities, the amount of time it takes to perform them, or the fact that claimant was not subject to an employer's performance standard while doing such activities).

Here, the ALJ concluded that Niemi's "reports of activities suggest much higher functioning than alleged" but failed to explain how Niemi's ability to engage in activities such as fixing meals, shopping for groceries "with help," watching movies, or playing with his children translates into him being able to work in a full time job, even with the limitations provided in the ALJ's RFC determination. (Tr. 77.) For instance, Niemi argues that the ALJ failed to consider that while he could help around the house and grocery shop, he only went grocery shopping "once in a while" because he had difficulty walking around the store, that he needs help holding the dust pan when sweeping because he is unable to bend over, and that he cannot lift a gallon of milk off a kitchen table. (Tr. 23-24, 27-28.) Likewise, although Niemi can play with his children, the ALJ neglected to consider that Niemi also testified he is unable to even bend over to hug them or pick them up and

10

"playing" involves watching movies or playing video games as opposed to running around with them. (Tr. 27-28.) The ALJ failed to inquire as to what Niemi actually does, how often, and how long its takes him, and he ignored the more recent Function Reports.

Thus, while the ALJ emphasized Niemi's ability to carry on these daily activities "albeit with some difficulty," without any discussion as to the intensity level with which he performed the activities or the amount of time he spent doing them, the ALJ's conclusion lacks logical support. Niemi may have been able to help around the house, play with his children, or even go camping and still not be capable of performing sedentary work requiring sitting up to six hours and standing and walking up to two hours in an 8-hour day. For example, Niemi testified that when sitting, the pain he experiences affects his ability to concentrate, and that he no longer does tattooing because he cannot sit and concentrate for the three to four hours it required. (Tr. 26-27, 34.) Yet, the ALJ failed to discuss or explain why the fact that Niemi could do certain activities of daily living in a limited manner undermines his credibility insofar as his symptoms prevent him from working full time.

The Commissioner argues that "the ALJ reasonably considered that Plaintiff's activities undermined his allegations of complete debility." (Def.'s Br. 5-6, ECF No. 15.) But Niemi argues he has never alleged complete debility, nor does he need to in order to be found disabled. Rather, he claims he has alleged pain and symptoms that prevent him from engaging in work on a full-time, sustained basis. The ALJ's credibility assessment failed to adequately explain how his ability to perform the stated daily activities was inconsistent, not with total debility, but with Niemi's alleged symptoms and limitations. This is not to say Niemi is disabled, only that the ALJ failed to create

11

a logical bridge between the evidence and his conclusion from which to review his decision. This error necessitates a remand.

This is not to say that there are not other reasons to question Niemi's credibility that appear in the record. The record also suggests that Niemi engaged in other activities that were inconsistent with the extent of pain and disability he was alleging. According to an emergency report dated August 7, 2008, for instance, he presented complaining of ankle pain after he fell off a set of stilts used for putting up drywall. (Tr. 436.) The report indicates that Niemi said he was demonstrating the stilts, and at the hearing he denied that he had fallen off of the stilts. Instead, he explained that he was in the back of a van showing a person who was going to buy them how to strap the stilts on when he injured his ankle without even getting up on them. (Tr. 40-41.) On June 30, 2009, Niemi again presented to the emergency department "with complaints of neck pain, headache and ringing in the ears." (Tr. 872.) According to the report, he stated he was carrying a table down some stairs when the leaf of the table slipped and he fell backwards. (*Id.*) Here, too, Niemi explained to the ALJ that the table was "a little end table" weighing "maybe 20 pounds" that he was helping his mother push down the stairs. (Tr. 32.) Later in August of the same year, Niemi returned to the emergency room complaining of severe back pain. He explained that he caught a swing set that his children were playing on when one side began to collapse. And on May 11, 2010, Niemi reported to the emergency room with a right knee injury reportedly caused by a fall on a driveway while chasing a child. (Tr. 904.) Niemi explained at the hearing that he gave chase to the child when he was running toward the busy street in front of his house and there was no one else there. (Tr. 41-42.) In assessing whether Niemi's activities were consistent with the degree of pain and disability he was alleging, the ALJ is not required to accept Niemi's benign explanation for each of these incidents,

especially to the extent they appear inconsistent with the hospital records. He may also find it noteworthy that only one of the four incidents resulted in a complaint of lower back pain.

Of course, the ALJ should also consider the effects of his pain medication on Niemi's ability to function. It is true, as the Commissioner points out, that Niemi repeatedly denied any side effects from his medication. (Tr. 197, 232, 268.) And Niemi never mentioned side effects at the hearing, even though the ALJ made clear to both Niemi and his attorney that they should let him know if he failed to address any impairments or other issues they believed pertinent. (Tr. 4, 19, 42.) On the other hand, Niemi did tell Dr. Tam Abdel, who examined him in November 2008, that he was currently choosing not to drive because of pain and the pain medications he was taking, and in his latest Function Report he stated he could not drive because of his pain medication. The ALJ will have to sort this issue out on remand as well.

Of course, the ALJ may conclude that Niemi's statements about his use of medication are not credible either. The record also contains substantial evidence suggesting that Niemi was not properly using his medication. As the ALJ noted, Niemi's neurologist discharged Niemi from his care for misuse of prescribed medication. (Tr. 74.) Dr. Ots' April 10, 2009 letter to Niemi advised him:

> I find it necessary to inform you that I am withdrawing from providing further professional medical service to you because according to the drug test that you did while you were taking OxyContin three times a day, it did not register on the screen. It is the policy of our clinic to not continue to provide prescriptions to patients that are not taking their controlled substances.

(Tr. 760.) Here, too, Niemi offered a benign explanation for the fact that, even though he was supposed to be taking OxyContin three times a day, none showed up in his urine screen. He claimed that Dr. Ots was confused. (Tr. 30.) But here, as well, the ALJ was not required to accept his

13

explanation. This is especially true since other doctors involved with Niemi's health care also raised concerns over his use of medication. His psychiatrist, Dr. Powers, noted a need to confront Niemi in December 2008 about "his needing multiple prescriptions since his last appointment because they were lost or he wasn't able to get them out of a friend's car that was impounded." (Tr. 307.) Three months later, in March 2009 Dr. Powers again noted that Niemi needed new prescriptions "even though I wrote him a script on March 6th" because he left his medication in a hotel room in which he had been staying. (Tr. 306.)

Similar problems were noted by physicians at the Emergency Department of the Dickenson County Health Care System. On November 21, 2008, several months before Dr. Ots terminated his care of him, Niemi was seen by Dr. Charles Papp in the Emergency Department for a medication refill. According to the report, Niemi explained that Dr. Ots had put him on OxyContin about six months earlier and he was supposed to have surgery on his neck in December (though Dr. Ots had previously ruled out surgery). Niemi stated that Dr. Mitchell gave him a prescription for ninety OxyContin in September, but his house was broken into and it was stolen. Dr. Papp noted that he had seen Niemi in the Emergency Department in October and had given him a prescription for a week's worth of OxyContin. Dr. Hayes had then given Niemi a prescription for another ninety OxyContin, but he had run out. Dr. Hayes was out of town and had told Niemi that he would not write him another prescription for any more OxyContin in any event. Niemi said he was supposed to see Dr. Groeneveld on December 5th and wanted enough OxyContin to get him through until he could see him. Niemi said that he had been to the Emergency Department earlier and was given a prescription for twenty Lortab 10 mg, but they had not helped his neck pain. Dr. Papp eventually gave Niemi a prescription for OxyContin, but told him this was the last time he would do so. (Tr.

14

672.) Similar concerns appear in another report dated June 3, 2009 less than two months after Dr. Ots terminated his care. On that date, Niemi appeared at the Emergency Department complaining of right knee pain. Dr. McDowell explained to Niemi that he would not be giving him any narcotics "because of his history of drug-seeking behavior noted in his previous charts." (Tr. 890.) Niemi declined further treatment, including X-rays and Toradol or Decadron shots, and just asked for a pair of crutches. (*Id.*)

Under circuit precedent, this court is not permitted to affirm the Commissioner's findings for reasons the ALJ did not give or on the basis of evidence the ALJ did cite. The Seventh Circuit has held that under what it calls the *Chenery* doctrine, the Commissioner is precluded from relying on evidence or a rationale for upholding the ALJ's decision that does not appear in the ALJ's decision. *See, e.g., Roddy v. Astrue*, ___ F.3d ____, 2013 WL 197924, *6 (7th Cir. Jan. 18, 2013) ("But the Commissioner cannot defend the ALJ's decision using this rationale directly, or by invoking an overly broad conception of harmless error, because the ALJ did not employ the rationale in his opinion." (citing *Chenery*)); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010) ("In doing so, the Commissioner advances a ground on which the ALJ did not rely, in violation of the *Chenery* doctrine."); *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010) ("But these are not reasons that appear in the ALJ's opinion, and thus they cannot be used here." (citing *Chenery*); *Parker v. Astrue*, 597 F.3d 920, 925 (7th Cir. 2010) ("Again violating the *Chenery* doctrine, as in Parker's case, the brief for the Social Security Administration points to evidence, not mentioned by the administrative law judge, by a psychiatrist who thought that the plaintiff's condition was not disabling."). Although the actual holding of *Chenery* does not appear to support such a broad rule, *see Senn v. Astrue*, Case

15

No. 12-C-326, Order Remanding Case, at 12-14 (E.D. Wis. Feb. 21, 2013), that is the law this court must apply. Thus, these are matters for the Commissioner to consider on remand.

Niemi also challenges the ALJ's emphasis on Niemi's ability to sit through the approximately hour-long hearing without the need to stand. The ALJ found this inconsistent with Niemi's own testimony and the opinion of Niemi's treating physician, Dr. F. Michael Saigh, who noted that Niemi was only able to sit for 15 minutes at a time without having to change positions. (Tr. 77.) Although a claimant is under no obligation to "sit and squirm" at a disability hearing, an ALJ's in-person observation of a claimant is an important component of his credibility determination. *Dixon v. Massanari*, 270 F.3d 1171, 1178-79 (7th Cir. 2001) ("Because the ALJ is in the best position to observe witnesses, we will not disturb her credibility determinations as long as they find some support in the record."); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) ("The hearing officer had an opportunity to observe Powers for an extended period of time and could gauge whether her demeanor, behavior, attitude and other characteristics suggested frankness and honesty and were consistent with the general bearing of someone who is experiencing severe pain."). Niemi contends, however, that the ALJ's observation that he was "in no apparent discomfort" during the hearing lacks support in the record. (Tr. 77.) He argues that the ALJ failed to acknowledge Niemi's testimony that the reason he was able to sit throughout the hearing without the need to stand was because he was shifting his weight from side to side to "take[] the pressure off the disks." (Tr. 34.) But there is no reason to believe that the sedentary jobs Niemi was found capable of performing would not similarly allow Niemi to shift his weight. Moreover, the testimony of Niemi and the opinion of Dr. Saigh was that Niemi could only sit for 15 minutes at one time before getting up. (Tr. 33, 913.) To the extent that the ALJ's observations during the hearing showed otherwise, it was not

16

unreasonable for him to consider that fact in assessing Niemi's credibility, as well as the reliability of Dr. Saigh's report. By itself, however, it is not sufficient to support the ALJ's credibility determination. Accordingly, the case will have to be remanded.

## II.    Assessment of Medical Evidence

Niemi also argues that the ALJ failed to properly weigh the opinions of the State agency consultants who reviewed the record and offered opinions about his impairments. He first notes that Dr. Baumblatt, who completed Physical Residual Functional Capacities Assessment on November 25, 2008, found his allegations of pain and related symptoms to be fully credible. (Tr. 489.) Dr. Baumblatt concluded:

> The claimant's degenerative disc disease in lumbar spine with compression of thecal sac could reasonably be expected to produce the alleged symptoms, and the allegations are not inconsistent with objective findings in the record. The credibility of his statements is further supported by the general consistency of the claimant's description of his symptoms within the progress notes and other medical evidence.

(Tr. 489.) Dr. Susan Donahoo, a State agency psychologist who completed a Psychiatric Review Technique on December 3, 2008, also found him credible. (Tr. 504.) Niemi suggests that the findings of Drs. Baumblatt and Donahoo are inconsistent with the ALJ's credibility determination and that his failure to address them also requires remand. (Pl.'s Br. 20, ECF No. 11.)

Niemi is comparing apples to oranges. The statements that Drs. Baumblatt and Donahoo found credible are not the same statements that the ALJ found lacking in credibility. This is clear from the fact that even though Dr. Baumblatt found Niemi's statements credible, he also concluded that Niemi could perform the full range of sedentary work without limitation. (Tr. 484-91.) And Dr. Donahoo's credibility determination was made in the context of her concluding that he had no

17

severe mental impairment. Neither opinion is inconsistent with the ALJ's finding that Niemi's testimony was "credible only to the extent consistent with a residual functional capacity for a range of sedentary work as found above." (Tr. 78.)

Niemi next argument, however, has merit. He argues that the case must be remanded because the ALJ failed to specifically address the opinions of Drs. Baumblatt and Bente, who completed a Physical Residual Functional Capacities Assessment on May 4, 2009. Dr. Bente's physical RFC assessment on May 4, 2009 was substantially similar to Dr. Baumblatt's earlier assessment. Both doctors concluded that Niemi was limited to occasionally lifting or carrying a maximum of 10 pounds and that he was able to stand and walk with normal breaks for at least two hours in an eight-hour workday. (Tr. 485, 783.) However, Dr. Bente determined that Niemi was able to sit for six hours in an eight-hour workday, while Dr. Baumblatt had found that Niemi must periodically alternate sitting and standing to relieve pain or discomfort. (Tr. 485, 783.) Additionally, while Dr. Baumblatt limited Niemi to sedentary work with no other restrictions, (Tr. 485), Dr. Bente's 2009 assessment limited Niemi to sedentary work, with added postural limitations of never climbing ladders, rope, or scaffolds, and only occasionally climbing ramps and stairs, stooping, kneeling, crouching, or crawling (Tr. 784).

The ALJ only made a cursory reference to these medical professionals' assessments. The ALJ mentioned the state agency doctors' opinions in stating that Niemi's treating physician had an opinion that "differed from that of a state agency physician." (Tr. 78.) The ALJ also noted that the "[s]tate agency doctors reviewed the record evidence and concluded that the claimant does not have a listing level impairment," and that "state agency doctors found no severe mental impairment (Exhibit 13F)." (Tr. 78.) In so finding, the ALJ referenced only the mental assessment completed

18

by Dr. Donohoo and said nothing about the physical assessments of Dr. Baumblatt and Dr. Bente. He then arrived at an RFC that differed from the RFCs set forth in both doctors' reports with no explanation of why. The ALJ included none of the postural limitations included in Dr. Bente's RFC. And while the ALJ's RFC did not require continuous sitting or standing or walking in excess of one hour at which time the claimant was to be allowed a two-minute "period of position change (to accommodate for related pain and the effects of pain medication)," it did not include a sit/stand option within the hour which seemed to be what Dr. Baumblatt's RFC required. In addition, given the absence of any findings on the effects of pain medication, it is not clear what the ALJ had in mind in formulating such an RFC. There was no mention of effects of pain medication in the hypothetical question put to the vocational expert.

Absent some explanation why, the case must be remanded. The regulations require the ALJ to evaluate every medical opinion received. 20 C.F.R. § 416.927(b), and while ALJs are not bound by findings made by state agency doctors, "they may not ignore these opinions and must explain the weight given to the opinions in their decisions." SSR 96-6p. When he relies on an opinion but fails to include all of the limitations, the ALJ must explain why the omitted limitations were rejected.

The Commissioner argues that any error from failing to include the postural limitations in Dr. Bente's RFC assessment is harmless since none of the jobs the vocational expert identified in the Dictionary of Occupational Titles as jobs Niemi could perform required a greater level of postural ability than Dr. Bente indicated. But that is a question a vocational expert is required to address, not the Court. Otherwise, why require a vocational expert in the first place? Further clarification is also needed as to the ALJ's inclusion of pain medication effects in his RFC.

19

Niemi's primary argument concerning the medical opinions is that the ALJ failed to give controlling weight to the opinion of Dr. F. Michael Saigh, Niemi's treating physician. An ALJ must give controlling weight to treating source opinions that are well supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with other substantial evidence in the case record. § 404.1527(d)(2); *Punzio*, 630 F.3d at 710. More weight is given to the opinions of treating physicians because they have greater familiarity with the claimant's conditions and circumstances. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). If the ALJ discounts the opinion of a claimant's treating physician, the ALJ must offer "good reasons" for doing so. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). The ALJ must decide what weight the treating source opinion deserves by considering a "checklist" of factors including the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion. *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010).

Here, the ALJ gave "little weight" to the opinion of Dr. Saigh. (Tr. 78.) He offered several reasons for doing so. First, the ALJ noted that Dr. Saigh "did not have the benefit of the extensive MRI scans and treatment notes of Pain Diagnostic Associates, Wisconsin Michigan Physicians, Florence Medical Center, Dickenson County Healthcare, Family Health Center, Marinette County Health & Human Services, and Dr. Guy Powers." (Tr. 78.) The ALJ also noted that Dr. Saigh's treatment notes did not reflect that he ever spoke with Niemi about his ability to work, that his opinion differed from that of the State agency consultant, and that he did not provide medical findings that supported his assessment. (*Id.*) The ALJ noted Dr. Saigh's opinion that Niemi would be off task 25% of the time was inconsistent with the opinion of Dr. Powers, his treating psychiatrist,

20

who found no deficits in his ability to focus or concentrate. (*Id.*) Contrary to Dr. Saigh's opinion, there was also no medical evidence that Niemi needed to keep his feet elevated 50% of a typical workday or that he was ever told he needed to do so. The ALJ also found Dr. Saigh's opinion that Niemi could sit for only fifteen minutes before he needed to get up refuted by his own observations of Niemi at the hearing and the daily activities Niemi described. Finally, the ALJ noted that had Dr. Saigh prepared his statement at the request of Niemi's attorney, rather than in the course of treatment. For all of these reasons, the ALJ concluded that Dr. Saigh's opinion was entitled to little weight. (*Id.*) Summarizing, the ALJ concluded that "[t]he inconsistencies between the claimant's own testimony and statements offered regarding daily activities and Dr. Saigh's opinion illustrates that the treating physician's opinion is not supported by the evidence." (Tr. 78.)

As to the summary statement, Niemi argues that the ALJ failed to explain what testimony he is referring to, or how it is inconsistent with Dr. Saigh's June 25, 2010 assessment. He also contends that the longitudinal record does support Dr. Saigh's opinion since his condition was progressive and that Niemi's complaints of pain and related symptoms were also consistent with his doctor's opinion. Niemi argues that the ALJ's reliance on non-examining state agency doctors' findings in giving less weight to Dr. Saigh's opinion eviscerates SSR 96-2p because "[v]irtually any case that comes before an ALJ would have a non-examining state agency doctor issuing an opinion finding the claimant not disabled. He also challenges the basis for the ALJ's conclusion that Dr. Saigh did not have access to the extensive history of testing and other records relating to Niemi's condition. The ALJ's rejection of Dr. Saigh's opinion that Niemi would be off task as much as 25% of the time as inconsistent with the opinion of his psychiatrist was also erroneous, Niemi argues, because the psychiatrist was looking at the effect of his mental impairment on his ability to

21

concentrate whereas Dr. Saigh was considering the effects of his pain. Finally, Niemi contends it was improper for the ALJ to conclude that Dr. Saigh's opinion was entitled to less weight because it was given in response to his attorney's request, as opposed to in the course of treatment.

The question of whether a treating physician's opinion is entitled to controlling weight is dependent on whether it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "'not inconsistent' with the other substantial evidence in the case record." SSR 96-2p, 1996 WL 374188, *1 (S.S.A.). This, in turn, "requires an understanding of the clinical signs and laboratory findings and what they signify." Dr. Saigh's records contain none of the opinions he provided Niemi's attorney. In fact, the relatively sparse set of records, which are barely legible, appear to contain primarily a recitation of Niemi's complaints, some findings based on what appear to be limited physical examinations, and notations concerning OxyContin, Tens Unit, and back and neck care and exercise. (Tr. 819-23, 825-32.) Although there is a notation of disc protrusions at various levels of the cervical and lumbar spine, it is unclear when or how this information was obtained. (Tr. 821, 822.) The records from Dr. Saigh were all submitted by Niemi's attorney, and they do not include any of the earlier diagnostic or treatment records from Dr. Ots and other doctors, nor is there any indication they were reviewed. The only radiology report is of an X-ray of Niemi's hip that Dr. Saigh had ordered in August 2009. (Tr. 823.)

Based on the record, the ALJ's finding that Dr. Saigh's opinion was not well-supported by medically acceptable clinical and diagnostic techniques was not unreasonable. There is no indication that Dr. Saigh had placed any limitations on Niemi's activities prior to his attorney asking him to fill out a Medical Source Statement four days before the hearing. (Tr. 912-15.) And although the Medical Source Statement Dr. Saigh completed directed him to attach "relevant treatment notes,

22

radiologist reports, laboratory and test results as appropriate," nothing was attached. (Tr. 912.) The ALJ therefore did not err in failing to accord Dr. Saigh's opinions controlling weight. In determining what weight Dr. Saigh's opinion should receive on remand, the ALJ should indicate the basis of his conclusion that Dr. Saigh did not review Niemi's previous medical record. Of course, to the extent his opinions rest on Niemi's statements to him in the course of treatment, the weight given to Dr. Saigh's opinions will likely be determined by the ALJ's credibility determination.

Accordingly, and for the reasons set forth above, the Commissioner's decision in this case must be **reversed and remanded** pursuant to 42 U.S.C. § 405(g)(sentence 4). Whether Niemi is disabled or not is for the ALJ or Commissioner to determine on remand in accordance with the procedural rules the Agency has implemented and the precedents provided by the Court of Appeals.

**SO ORDERED** this __1st__ day of March, 2013.

　　　　　　　　　　　　　　　　 s/ William C. Griesbach
　　　　　　　　　　　　　　　　 William C. Griesbach, Chief Judge
　　　　　　　　　　　　　　　　 United States District Court

Case 1:12-cv-00157-WCG   Filed 03/01/13   Page 23 of 23   Document 19